# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:23-cv-167-MOC-WCM

| | | |
|---|---|---|
| APAC-ATLANTIC, INC., | ) | |
| | ) | |
| **Plaintiff, pro se,** | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| OWNER'S INSURANCE COMPANY, | ) | |
| | ) | |
| **Defendant.** | ) | |

**THIS MATTER** comes before the Court on the parties' cross Motions for Summary Judgment. (Doc. Nos. 11, 15).

## I.     PROCEDURAL BACKGROUND

Plaintiff, APAC-Atlantic ("APAC") hired Emery Sealco ("Emery") to install stationary advance warning signage at a road repaving project. APAC was added to Emery's an insurance policy though Owner's Insurance Company's ("Owner's") as an additional insured but only with respect to "liability arising out of [Emery's] work for [APAC]."

After installation of the stationary advance warning signs and while APAC was repaving the road, two separate motorcycle accidents happened, resulting in personal injuries to the passengers. A lawsuit was filed against APAC ("the underlying lawsuit"). APAC tendered the defense to Owner's, which defended the underlying lawsuit under a reservation of rights. However, after extensive discovery and during the pendency of the underlying litigation, Owner's informed APAC that no indemnity coverage would be provided under the policies because the accidents did not arise out of the work performed by Emery on the project; therefore,

APAC was not an additional insured under the Commercial General Liability ("CGL") policy. Following a mediation in the underlying lawsuit, APAC settled the matter and has now filed this action seeking reimbursement from Owner's of the settlement amount of the underlying lawsuit plus interest.

## II. FACTUAL BACKGROUND

### 1. The Prime Contract

On July 2, 2018, Plaintiff, APAC-Atlantic, was awarded a state funded contract from the North Carolina Department of Transportation for the milling, resurfacing and shoulder restoration of various roadways in Haywood and Jackson Counties, North Carolina ("the project"). See (Defendant's Responses to Plaintiff's Requests for Admissions ("Def. Resp. to RFA"), Contract attached as Ex. 1 ¶ 1 (Exs. A & B)). The original contract called for payment to APAC totaling $13,052,189.87. (Id.).

The contract details all requirements to provide work zone traffic control in sections TC-1 – TC-6. (Id.).TC-1 provides that APAC was to install "Work Zone Advance Warning Signs in accordance with the detail drawing provided in these plans prior to beginning any other work." (Id.). That "Work Zone Advance/General Warning Signing" responsibility is identified as Line Item #13 on the Contract Item Sheets for C204188. (Id.) APAC's bid amount for that item was $66,375.00. (Id.). Line Item #13 involved stationary signage that was to be installed prior to commencement of the pavement work. (Id.).

The Contract with NCDOT also contained Line Item #14, designated as Temporary Traffic Control, for which APAC was paid a lump sum of $630,000.00. (Id.). As will be discussed in more detail below, Line Item #14 encompassed the portable signage, including those

signs described on TC-2, TC-4 and TC-5 of the contract, that is at the heart of this dispute. Line Item #14 at all times remained APAC's contractual responsibility.

### 2. The Subcontract

On or about July 24, 2018, APAC entered into a subcontract ("the subcontract") with Emery. Pursuant to that agreement, Emery subcontracted to install the stationary work zone advance/general warning signing before the paving work commenced, pursuant to Line Item 13 of the contract between APAC and NCDOT. <u>See</u> (Def. Resp. to RFA ¶ 2, Contract p. 6 of 8, attached as Ex. 2 thereto, and Defendant's Responses to Plaintiff's First Set of Interrogatories ("Def Disc. Resp"), ¶ 3 (Exs. C &D)). Emery was paid $44,250.00 to perform Line Item #13. (<u>Id.</u>). The Temporary Traffic Control requirements under Line Item #14 were never subcontracted or delegated to Emery.

### 3. The Stationary Uneven Pavement Signs

Before construction/paving began on the section of U.S. 17 where the accidents forming the basis of this dispute occurred, Emery installed stationary uneven pavement signs at the direction of and with the approval of NCDOT and APAC. (Def. Resp. to RFA ¶13). The NCDOT log books indicate that Emery installed 15 "Uneven Lanes" signs on U.S. 74 eastbound on August 3, 2023, 15 "Uneven Pavement" signs on U.S. 74 westbound on August 11, 2018, and one "Uneven Pavement" sign on U.S. 74 eastbound on August 11, 2018. <u>See</u> (NCDOT Logbooks (Ex. E)). Placement of those stationary uneven pavement signs was not part of Emery's initial scope of work but was part of a subsequent verbal agreement between Emery and APAC. (<u>Id.</u> ¶ 15). The DOT inspectors were present when those signs were installed, and the DOT and APAC instructed Emery where to place them. <u>See</u> (Chad Emery Deposition, P. 45 (Ex. F)). Following placement of those stationary signs, Emery was never asked to remain on the project site to

monitor pavement activities and was never asked to return to the project to install any additional signage, including portable signs. (Plaintiff's Responses to Defendant's Requests for Admissions ("Pl. Resp. to RFA") ¶¶ 17 & 25 (Exhibit G)). Paving had not begun, and no uneven pavement existed, when Emery installed the stationary uneven pavement signs. (Id. ¶ 5). The paving work did not begin until August 19, 2018. See (timeline (Ex. H)).

### 4. The Underlying Lawsuit

On September 7, 2018, while the paving project was underway on U.S. Highway 17 headed west before the exit for Maggie Valley, Don and Melinda Craft were involved in a motorcycle crash when Craft's motorcycle lost control as the motorcycle came down off the pavement separating the two westbound lanes. (Def. Resp. to RFA ¶ 10). As a result of the crash, Don Craft ultimately died after several weeks in the hospital and Melinda Craft sustained several serious injuries. (Id.). Two days later, on September 9, 2018, in the same location, Tim and Donna Lozaw were involved in an accident when Mr. Lozaw lost control of his motorcycle on the pavement edge separating the two westbound lanes resulting in injuries to Donna Lozaw. (Id. ¶ 11).

Melinda Craft, the Estate of Don Craft, and Donna Lozaw filed a lawsuit on November 14, 2019 in Georgia State Court, which was removed to the United States District Court of the Northern District of Georgia. (Id. ¶ 12). In the underlying lawsuit, Plaintiffs alleged that APAC was negligent in, among other ways, failing to place uneven pavement signs prior to the area where the lanes were uneven so that motorists had advance warning. (Def. Resp. to RFA, Underlying Complaint attached as Exhibit 7 thereto, ¶ 30(f) (Exhibit I)). APAC notified Emery and Owner's of the underlying lawsuit and demanded that Owner's defend and indemnify APAC. (Id. ¶ 20). Through correspondence dated January 30, 2020, Owner's acknowledged receipt of

the underlying suit and agreed to payment of APAC's defense costs pursuant to a reservation of rights. (Id. ¶ 22). W. Curtis Anderson of Downey & Cleveland represented APAC and Owner's paid the legal fees to defend APAC in the underlying lawsuit. (Id. ¶¶ 24–25). During discovery the investigating officer, Trooper Holcombe, testified that there were no uneven pavement signs along the roadway in the westbound direction in advance of the stationary uneven pavement signs installed by Emery. See (Trooper Holcombe Deposition, pgs. 36-40 & 49-54 (Exhibit J)). This fact is not in dispute, as APAC admits that they failed to place portable uneven pavement signs in advance of the uneven pavement.. (Pl. Resp. to RFA ¶ 18). Moreover, APAC admits that it did not fulfill its temporary traffic control obligations as set forth in the NCDOT contract and that such acts and/or omissions were a proximate cause of the collisions referenced in the underlying lawsuit. (Id. ¶ 16).

Additionally, expert witness James Kellenberger, P.E., testified that: "it is my opinion that the hazardous conditions of uneven lanes, without proper advanced warning, were directly responsible" for the motorcycle crashes. (Jim Kellenberger Expert Report, p. 15 (Ex. K)). Mr. Kellenberger also testified that, in his opinion, instead of APAC using the required portable signs and placing the signs themselves at the required locations during the paving, they had Emery post the stationary uneven signs before the paving began so that APAC "would not have to worry about it." (Jim Kellenberger De. pp. 162–63 (Ex. L).

Mediation was held in the underlying lawsuit on July 26, 2021. (Id. ¶ 27). The mediation resulted in an impasse, but at its conclusion the Plaintiffs and APAC agreed to allow the mediator to make a proposal to settle the underlying lawsuit. (Id. ¶¶ 28–29). APAC demanded that Owner's agree to pay the proposed settlement to resolve all claims in the underlying lawsuit. (Id. ¶ 34). Owner's informed APAC that no coverage would be extended under the Owner's policies

and Owner's would not pay the proposed settlement amount because APAC did not qualify as an additional insured. (Id. ¶ 35). APAC accepted the proposed settlement amount, and APAC tendered settlement payments to the Plaintiffs in a total amount of $5.5 million. (Id. ¶¶ 39–42). APAC thereafter filed this lawsuit seeking recovery of the settlement sums, plus interest from Owner's. See (Pl. Compl. Doc. No. 1).

**5.      The Insurance Policies**

The subcontract between APAC and Emery required Emery to name APAC as an additional insured on its commercial general liability policy, policy number 104615-35101773-18, and commercial umbrella policy, policy number 46-101- 773-101, both issued by Defendant Owner's. (Def. Resp. to RFA ¶¶ 5, 7—8). Pursuant to the subcontract, APAC was added to the Owner's policies as an additional insured, and Owner's issued a Certificate of Insurance on or about February 15, 2018. (Id. ¶ 9).

The Additional Insured endorsement contained in the Owner's policy issued to Emery states the following:

BLANKET ADDITIONAL INSURED

This endorsement modifies insurance provided under the following:

COMMERICAL GENERAL LIABILITY COVERAGE FORM.

A. Under SECTION II-WHO IS AN INSURED, the following is added:

A person or organization is an Additional Insured, only with respect to liability arising out of "your work" for that Additional Insured by or for you:

1. If required in a written contract or agreement; or

2. If required by an oral contract or agreement only if a Certificate of Insurance was

issued prior to the loss indicating that the person or organization was an Additional

Insured.

(Def. Resp. to RFA, Policy attached thereto as Ex. 4, p. 118 (Ex. M)).

The policy defines "your work" as follows: "work or operations performed by you … and

materials, parts or equipment furnished in connection with such work or operations." "Your

work" also includes "warranties or representations made at any time with respect to the fitness,

quality, durability, performance or use of 'your work', and the providing of or failure to provide

warnings or instructions." (Id. at 148).

The Umbrella Policy obligates Owner's to "pay those sums included in ultimate net loss

that the insured becomes legally obligated to pay as damages because of bodily injury." (Def.

Resp. to RFA, Umbrella Policy attached as Ex. 5, p. 15. (Ex. N)). The Umbrella Policy provides

coverage to APAC as a Persons and Organizations Insured to the extent that APAC qualifies as

an insured in the scheduled underlying insurance, in this case the CGL Policy. (Id. at 25).

Although APAC had Commercial General Liability Insurance with Liberty, APAC was self-

insured up to $15 million, and Liberty is not a party to this lawsuit. (30(b)(6) Deposition of

APAC-Atlantic p. 16:2–6).

III.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.

56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When determining whether a genuine issue has been raised, the court must construe all

inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248.

In the context of an insurance coverage dispute, summary judgment is appropriate where the material facts and the relevant language of the policy are not in dispute and the sole point of contention is "whether events as alleged in the pleadings and papers before the court are covered by the policies." Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 315 N.C. 688, 690–91 (1986). The party seeking coverage under an insurance policy bears the burden to allege and prove coverage." (Id.).

This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). In a diversity case, a district court will apply the conflict of laws rules of the forum state. See, e.g., Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941). North Carolina law regarding insurance

contracts states that "the principle of lex loci contractus mandates that the substantive law of the state where the last act to make a binding contract occurred, usually delivery of the policy, controls the interpretation of the contract." <u>Fortune Ins. Co. v. Owens</u>, 351 N.C. 424, 428 (2000). The policies at issue in this suit were issued and delivered to Emery in North Carolina, and therefore, North Carolina law controls. <u>See</u> (Compl. ¶ 21; Answer ¶ 21).

## IV. DISCUSSION

This case deals with the interpretation of the provisions of the insurance policy issued by Defendant. In North Carolina interpreting insurance policies is a matter of law. <u>Gilbert v. NC Farm Bureau Mut. Ins. Co.</u>, 155 N.C. App. 400, 403 (2002). An insurance policy is a contract, and its provisions govern the rights and duties of the parties. (<u>Id</u>.). The goal when interpreting insurance policies is to arrive at the intent of the parties when the policy was issued. (<u>Id</u>.). The intent may be derived from the language in the policy and, if the policy is clear, the courts may not rewrite the policy. (<u>Id</u>.). In other words, "where there is no ambiguity in the language used in the policy, the courts must enforce the contract as the parties have made it and may not impose liability upon the company which it did not assume and for which the policyholder did not pay." <u>Grant v. Emmco Ins. Co.</u>, 295 N.C. 39, 42 (1978).

Summary judgment is an appropriate remedy in this case because the question of whether Owner's has a duty to indemnify APAC under the terms of their policy is determined by the interpretation and application of the additional insured language contained in the CGL policy.

Plaintiff's Complaint pleads causes of action for breach of contract, declaratory relief, and equitable subrogation. All three causes of action are based on the premise that APAC was an additional insured under Emery's insurance policies and is entitled to indemnification or reimbursement of the settlement amount from Owner's. Owner's contends in its own summary

judgment motion that APAC cannot meet their burden of proving coverage under the policies, and thus summary judgment should be granted in favor of Owner's.

**1. No Advance Warning Uneven Pavement signs were required under Line Item 13.**

The parties agree that Emery was subcontracted by APAC to complete Line Item #13 of the prime contract. TC-1 describes the "Work Zone Advance Warning Signs" that Emery was obligated to install pursuant to that line item. It specifically references Standard Drawing Nos. 1101.02, 1101.11, 1110.01, 1110.02, 1130.01, 1135.01 and 1180.01 of the 2018 Roadway Standard Drawings. Those Drawings, attached as Exhibit O, include signs such as "Begin Road Work," "End Road Work," and "Be Prepared to Stop," and numerous lane closure signs. They do not, however, include any reference to uneven pavement or uneven lane signs, and it is uncontroverted that Emery's responsibility to install stationary advance warning signs under Line Item #13 did not include any such requirement. TC-4 provides that "all stationary signing is to be installed as shown on the detail drawing(s) unless otherwise directed by the Engineer. The signs as shown on the detail drawing(s) are all that are required for a contractor to begin a resurfacing contract." Again, nowhere in the drawings or the 2018 NCDOT Standard Specifications is there a requirement that permanent advance warning uneven pavement or uneven lanes signs be installed before commencement of the work, and it is undisputed that Emery properly installed the signs called for in those detailed drawings.

**2. The only contractual requirement for such signage existed under Line Item 14, which was the responsibility of APAC.**

TC-2 describes the limited circumstances under which "Uneven Pavement" signs in advance of uneven pavement are required:

Thus, the contractor's duty to install uneven pavement signs in advance of the uneven pavement was triggered under the following limited conditions:

• The paving lifts must be 2 inches or less.

• If they are not brought up to elevation within 72 hours, the Contractor (APAC) must install portable Uneven Pavement signs in advance of the uneven pavement until the condition is mitigated. Once mitigated, the portable Uneven Pavement signs must be removed.

• No additional compensation is allowed for those signs because they are already included in the Temporary Traffic Control pay item (Line Item 14).

The contract is clear that the duty to install uneven pavement signs is triggered only after the uneven pavement exists for more than 72 hours, and that the signs must be portable because they are to be removed as soon as the condition is mitigated. The contract is also clear that this obligation is part of TCC pay item #14, which was the sole responsibility of APAC for which it received a lump sum payment of $630,000.

TC-4 further elaborates that the portable warning signs such as "uneven lanes," grooved pavement," and "rough road" are "incidental to the other items of work included in the temporary traffic control (Lump Sum) pay item" for which the contractor will receive no additional compensation. In other words, the obligation to place portable uneven pavement signs (and to remove those signs) as paving conditions warranted was the sole responsibility of APAC, for which it was already compensated. TC-5 reinforces the fact that the Temporary Traffic Control (Line Item #14) obligation of the contractor includes portable signs and message boards, that those signs are part of the contract lump sum price paid to the contractor ($630,000), and that the TTC pay item does not include work zone advance or general warning signs (Line Item

#13) subcontracted to Emery. <u>See also</u> (NCDOT's Resurfacing Advance Warning Signs for High Speed Facilities drawing (and the notes at the bottom), Ex. P).

**3. The stationary uneven pavement signs installed by Emery at the direction of APAC and NCDOT before commencement of work did not discharge and could not have discharged APAC's duties under Line Item #14.**

As indicated above, Emery was hired to install stationary work zone signage at the site pursuant to Line Item #13 of the prime contract, and it properly fulfilled that obligation. It was also called back to install several stationary uneven pavement signs at the direction of APAC and the NCDOT, before commencement of work. Plaintiff's entire case is based on the misplaced argument that these stationary uneven pavement signs that were not part of the original subcontract and were installed before the creation of any uneven pavement, somehow trigger coverage under Emery's CGL policy because sometime after those stationary signs were installed by Emery, APAC created (and failed to mitigate) uneven pavement that extended beyond those previously erected stationary signs.

Here, APAC essentially eschewed its TCC responsibilities under Line Item #14, by improperly and inexplicably relying on the stationary uneven pavement signs installed by Emery at the beginning of the project, before any uneven pavement existed. The whole point of the portable uneven pavement signs required under Line Item #14 was to place those signs when and if conditions warranted—when the pavement differential of 2.0 inches or less existed for more than 72 hours—and then to remove them immediately after the condition was mitigated.

Nowhere in any of the drawings or contractual provisions is there a requirement that uneven pavement signs remain present throughout the duration of the project, regardless of whether there is in fact uneven pavement at any given time. No uneven pavement signage would

have been required (or allowed) when Emery installed the stationary work zone signage in August of 2018, since paving had not even begun and there was no uneven pavement. The requirement that portable signs be placed was based on evolving jobsite conditions, and it would have been impossible for Emery to fulfill that aspect of APAC's contract with the NCDOT since Emery was not hired to and did not remain on the job site and would not have known if or when the conditions warranted use of those portable signs. As established in TC-2, TC-4 and TC-5, placement of that signage was the exclusive responsibility of APAC under Line Item #14 of the contract.

**4. APAC's liability did not arise out of Emery's work.**

The language in Owner's policy defining what makes one an additional insured reads as follows: "A person or organization is an Additional Insured, only with respect to liability arising out of "your work" for that Additional Insured by or for you." To place that into context between these parties, it would read as follows: "APAC is an Additional Insured, only with respect to liability arising out of Emery's work for APAC by or for Emery." In other words, the Court agrees with Owner's that the plain language of the additional insured endorsement contained in the Owner's' policy extends coverage to APAC only with respect to liability arising out of Emery's work on the project. As noted, in interpreting a contract, the Court must ascertain the parties' intention at the moment of execution. Bowles v. Bowles, 237 N.C. 462 (1953). This Court therefore looks to the intent of APAC and Emery when entering into the subcontract.

APAC, which received over $13 million in compensation under their contract with the NCDOT, has not shown that they reasonably expected to be covered under the CGL policy of a subcontractor who was paid a small fraction of that amount to install advance warning signs that had nothing to do with the accidents. Emery could not have reasonably anticipated that APAC

would make the calculated risk of self-insuring on the front end and then attempt to shoehorn coverage under Emery's CGL policy on the back end. Because the undisputed material facts developed in the underlying lawsuit establish that the potential liability of APAC did not arise out of any work performed by Emery for APAC, APAC's efforts to shift responsibility to Owner's for its own liability are unavailing and are therefore rejected.

There is limited case law in North Carolina discussing the provision in a policy which requires that liability "arise out of your work." Other jurisdictions have had more opportunity to explore this type of policy provision; however, most of those cases deal with an injury to an employee of the named insured while performing work on the premises of an additional insured, not an injury to a completely unrelated third party, such that those cases are easily distinguishable.

The leading North Carolina case addressing this issue is Pulte v. Ame. S., 185 N.C. App. 162 (2007), which adopts the majority view that for liability to arise out of the work of a named insured, it is not necessary for the named insured's acts to have caused the accident; rather, it is sufficient that the injury is in connection with the performance of the named insured's business, even if the cause of injury was the negligence of the additional insured. It is important to note, however, that even though there need not be negligence alleged against the named insured and the cause of the injury could be the sole negligence of the additional insured, the accident or injury still must arise out of the performance of the named insured's work. North Carolina Courts have held that "arising out of" does not rise to the level of proximate cause, but instead requires a simple causal nexus between the additional insured's liability and the named insured's work. State Capital v. Nationwide, 318 N.C. 534 (1986).

Therefore, for APAC to be considered a named insured under the additional insured coverage of the Owner's policy, any liability of APAC in the underlying lawsuit must be a "natural and reasonable incident or consequence of [Emery's] operations" or work at the project site. See Pulte, 185 N.C. App. at 168. Although not binding on this Court, this case is similar to the Ohio case of Davis v. LTV Steel Co., 128 Ohio App. 3d 733 (1998). That case arose out of injuries to two of Shafer's employees, a contractor hired by LTV steel to clean and vacuum a tar sump and its pumps at LTV's premises. The evidence showed that the employees fell into a dike siphon sump in an area of the plant that was under the exclusive control of LTV after an LTV employee asked them to close a valve. The closing of the valve was not contemplated as part of Shafer's duties pursuant to its contract with LTV, and there was no dispute that LTV hired Shafer to clean and vacuum the tar sump and its pump and that Shafer was not contracted to do anything related to the dike siphon sump. The Court thus held that the injuries did not arise out of Shafer's performance of its cleaning operations at the LTV plant, and LTV was therefore not entitled to additional insured coverage under Shafer's policy.

The same outcome is warranted here. Like the Davis case, placement of the portable signs was not contemplated as part of Emery's duties pursuant to its contact with APAC. The facts ascertained in the underlying lawsuit are clear that if these accidents were related to signage (or lack thereof), they were related to APAC's failure to install portable uneven pavement signs as that uneven pavement was being created. The "Temporary Traffic Control Requirements," found at line item 14, are the only requirements in the contract calling for uneven pavement signs, and they were intended to be portable to accommodate the changing conditions of the road resurfacing. That responsibility was never subcontracted or delegated to Defendant. Although Emery was called on to install several stationary uneven pavement signs before repaving started,

after several days of paving operations APAC created an uneven pavement condition that extended beyond those signs and remained unmitigated when the accidents happened. Moreover, the accidents did not arise out of the presence of those stationary signs. If the accidents arose out of signage, they arose out of APAC's failure to discharge its TCC responsibilities under Line Item #14 and place (and remove) portable uneven pavement signs as conditions of the project warranted.[1] Thus, the Court will award summary judgment to Owners.

## V.    CONCLUSION

For the reasons stated herein, the Court DENIES APAC-Atlantic's summary judgment motion (Doc. No. 11), and the Court GRANTS Owner's summary judgment motion (Doc. No.15).

Signed: September 23, 2024

Max O. Cogburn Jr
United States District Judge

---

[1] The Court has considered the parties' judicial estoppel arguments and finds that APAC is not judicially estopped from asserting its arguments supporting summary judgment.